Day *v.* Kent.

J. P. DAY, Plaintiff in Error, *v.* L. D. KENT, Defendant in Error.

*Appeal from County Commissioners in District Court.— Error to Douglas.*

1. The votes of a precinct cannot be rejected because there was no poll-book sent to the county clerk.
2. Irregularities in collecting evidence as to the result of an election, will not avail in contesting such result, if it can be properly ascertained to whom a majority of the legal votes were given. The office will be awarded to him who is found to have such majority.

DAY and Kent were candidates for the sheriffalty of Douglas County, at the June election, 1854. When the county

canvassers had duly examined the returns of said election for said county, they found that Day had received the highest number of votes for said office, and gave to him a certificate of his election. Day then entered upon the discharge of his duties as sheriff of Douglas County. On the 3d day of July, Kent gave notice to Day that he would contest the said election, in which notice he stated as cause for such contest:

*First.* " That there never was any legal election held in Cow Creek precinct, in said county, or if legal, no return was made to the auditor of said county."

*Second.* " That the return of the polls from the precinct of Canyonville are irregular and insufficient in law."

Justice Deady heard the case at chambers, on the 18th of July, and decided that there was no legal return to the county auditor of the election in Cow Creek precinct, and therefore Kent, and not Day, was entitled to said office, and a certificate of election as sheriff of Douglas County was thereupon issued to him.

According to the returns of said election, including that from Cow Creek precinct, Day had 228 votes, and Kent 207, for sheriff of said county ; but rejecting the return from Cow Creek, Day has 205, and Kent 207 votes for said office. Nothing is now said by Kent as to the incorrectness of said election, further than Cow Creek precinct is concerned, so that the sole question for this court to decide is, whether the votes of Cow Creek precinct ought to be counted for Day or not. The following is the return from said precinct :

" Pursuant to this notice, an ———— was held at the house of G. F. Hall, Cow Creek precinct, Douglas Co., O. T., June 5th, 1854, for the election of the following named officers for county and precinct, agreeable to an order of the acting clerk of the county commissioners, Douglas Co., O. T., (R. H. Dearborn,) votes having been cast by the citizens of Cow

Day *v.* Kent.

Creek for the following named officers : 'For Council, A. V. Bentley received seven votes, 7 ;' 'For Council, James Maver received two votes, 2 ;'" and so on through all the county and precinct offices. In the list is this statement : "For Sheriff, J. P. Day received twenty-three votes, 23." Subjoined to said list is the following :

" Hardy Elliff, judge of the election, appointed by the court of Douglas County, O. T. ; G. F. Hall, by the same ; third judge by G. F. Hall and Hardy Elliff, A. V. Bentley, as appointed by G. F. Hall and Hardy Elliff, judges of election ; also B. E. Simmons and W. P. Coats, as clerks of said election, do hereby certify that the polls were opened and closed according to law, and that the same number of votes for and against the aforesaid candidates, and the same we verily believe to be correct ; furthermore, that twenty-four votes were cast against becoming a State of the Union, and remaining as we now are, a territory.

G. F. HALL,
HARDY ELLIFF,
A. V. BENTLEY,
*Inspectors.*

B. E. SIMMONS,
W. P. COATS,
*Clerks.*

Filed June 15th, 1854.

R. H. DEARBORN,
*Deputy Auditor, Douglas County, O. T.*"

Section, 27, Oregon Statutes, page 57, provides that the clerks, when the poll-lists are made to agree, shall write out upon the poll-book a certificate, as nearly as circumstances will admit, in the following form :

" At an election held, &c., (giving place and date,) the following named persons received the number of votes annexed

to their respective names, for the following described offices, to wit:

A. B. had —— votes for delegate to Congress.

C. D. had —— votes, &c., (and in like manner for any other person voted for.)

Certified by us, G. H., J. K., L. M., judges of election.

Attest, A. B., C. D., clerks of the election."

Section 28 provides for sending one of these poll-books, certified as above required, to the clerk of the board of county commissioners, and for depositing the other with one of the judges of the election, to be " subject to the inspection of any elector, at any time thereafter, who may wish to examine the same."

*R. P. Boise*, for plaintiff in error.

*B. F. Harding*, for defendant in error.

WILLIAMS, C. J. Kent says that no poll-book was sent by the judges of the election in Cow Creek precinct to the county auditor, as directed in section 28, and, therefore, the return from said precinct should be wholly rejected.

Assuming the premises to be true, the legal conclusion drawn therefrom does not follow. County canvassers are only required to decide who has received " the highest number of votes," for any office to be filled by an election of the people, and no poll-book is necessary to enable them to make that decision. Clerks and judges of election in each precinct of a county are compelled to send to the county auditor a certificate, to which the one from Cow Creek conforms in substance, and these certificates together constitute the evidence upon which the county board determine the result of the election for that county. Had the poll-book of Cow Creek precinct been returned with the certificate, as the statute contemplates, such poll-book would only have shown that A., B. and C. voted at the election, and not for whom

*Day v. Kent.*

they cast their votes, so that the county convassers, with the poll-book, could not have decided otherwise than they did without it. True, the clerks should have written out their certificate in the poll-book, but this error is not fatal to the return, for in point of fact it makes no difference whether the certificate is written on one piece of paper or another, provided it is written, and contains in substance what the law requires. When, therefore, the county convassers had all the evidence as to the choice of the electors in Cow Creek precinct, which a technical compliance with the law would have furnished, and their decision accords with that evidence, nothing in law or reason seems to demand a reversal of such decision, because some collateral and immaterial act was not correctly performed by a ministerial officer. Each clerk at an election is required to keep a poll-book, which is properly nothing more than a list of the voters' names. One of these books is to be held by a judge of the election, for the examination and use of the electors; the other is to be sent to the county auditor, for the convenience, it is to be presumed, of the county officers. When no poll-book is filed with the county auditor, it is said no opportunity is afforded to contest the validity of the election by one who may feel aggrieved at the result of the canvass. This, if true, proves nothing to the point in this case. Judges and clerks may omit to show all about an election, and yet show that one has taken place, and how it terminated. Evidence for those wishing to contest an election, which is the poll-list, is one thing. Evidence for the county convassers, which is the certificate, is another and different thing. The non-existence of the one does not involve the non-existence of the other. Poll-books, however, are kept in all the precincts of the county, to accommodate those who wish to inspect or use them with reference to the election. Much of the argument for Kent proceeds upon the assumption that no lists of the voters' names were kept at the election, but there is nothing in this case to support this position. No such list, it seems, was returned to the county clerk, as the statute requires; but it is very illogical to argue

that because a thing does not exist in a particular place, it does not exist, therefore, at all. Judges and clerks of elections will be presumed to discharge their sworn duties until the contrary appears. To keep a poll-book is a duty enjoined upon the clerks by law, and without any evidence to prove otherwise, courts will presume a compliance with that law. Admitting, however, that no poll-books were made by the clerks of the election in Cow Creek precinct, it does not then follow that there was no election in that precinct. No one pretends that there was any fraud or corruption in this matter, nor is it even pretended that Day did not get twenty-three legal votes at the Cow Creek polls, but the defect in the said return is supposed to be fatal to all the other facts and rights in the case. Statutes, prescribing the manner in which a public officer shall perform an act, are generally regarded as directory, and admitting the officer to have power, his disregard of such statutes, in doing the said act, will not destroy the rights of an innocent person. (4 *Wheaton*, 503–7; *Iredell*, 157–313; *Monroe*, 344–7; *Blackford*, 156.)

To sacrifice the end of an enterprise, when attained, for mistakes in the mode of precedure, is to throw away the kernel and preserve the shell. Times and places for holding popular elections are appointed by law, to enable freemen to make choice of persons to fill the offices of the government.

When, therefore, the qualified voters of an election district, at the time and place fixed by law, deliver their ballots to a legal depositary, the choice of the people of that district is made. Whoever has received a majority of the legal votes cast, is as much elected at the closing of the polls, as he possibly can be by means of that election. The choice of the voters has become a perfect fixed fact. To make proof of that fact is all that remains to be done. Counting the votes and making the returns are no part of the election, but the mere steps of the agents of those who have voted, to make known the result. Now, it must be evident that it is quite immaterial to the electors and the elected, whose rights are involved in the transaction, in what way the choice of the

Day *v.* Kent.

people is discovered, if the means used suffice to carry that choice into effect. The whole object of the election is then accomplished. For the sake of convenience, expedition and certainty, the law points out a mode for collecting the evidence, but a failure to follow that mode amounts to nothing, if the same effect is gained which an adherence to the mode would have produced, and the man receiving a majority of the votes gets the office. Truth, if recognised, is not to be rejected because it comes through an imperfect channel. Suppose the law had required a judge to save the ballots for evidence, instead of the poll-book, would their destruction, after they had been given and counted, invalidate the election?

Suppose there had been no return whatever from Cow Creek precinct, but Day had received the certificate of election, and Kent had then contested, Day would be allowed to prove by parol that he had received twenty-three votes in said precinct which had not been counted for him, and thus sustain his right to the office, for his rights would not depend upon the acts or omissions of judges and clerks, but upon the votes of the people. Is Day worse off, with an imperfect return, than he would be with no return at all? Legal distinctions have been confounded in what has been said for Kent in this case, for it has been contended that the doctrine here laid down would make the choice of a person for office, by any loose assemblage of men, an election.

Voting implies something more than the mere expression of an elector's will. When a man votes he must express his will *viva voce* or by ballot, at a time and place fixed by law, and to a person having color of right to receive such expression, and these are all necessary and essential parts of the act of voting. To vote, an elector must do all that the law requires *him* to do in the performance of the act, and then he has voted, and nothing can afterwards be done by others to deprive him of the benefit and effect of that sovereign act. Judges and clerks may prove ignorant or corrupt, may return poll-books or not, as they please; but the just judgment of the

law will give the elector his vote, when its intent and effect are made to appear before the proper tribunal. Surely there is a broad difference between the perfect effective act of vot· ing, and the mere attestation of a clerk to such an act. These views, it is said, open the door to fraud and corruption in elections. How this is to happen does not appear. Judges and clerks of election (five in number) are sworn " to perform their duties according to law and the best of their abilities, and studiously endeavor to prevent fraud, deceit or abuse, in conducting the election" at which they act. All their proceedings are public, and it is next to impossible for the judges of an election to add to or take from the legal.votes of a precinct, without detection and exposure. Those guards which the law throws around the ballot-box cannot be knowingly disregarded by the officers of an election without the moral guilt of perjury. Mistakes will, however, sometimes occur, but there is no reason in allowing them to destroy all the right and good with which they happen to be connected. Citizens, when they vote, acquire a right to have their suffrages regarded, and the person to whom they are given acquires a right to have them estimated in his favor; and it would be unjust, not to say absurd, to hold that all these rights are destroyed by the mistakes of every petty officer who has to deal with the evidence of the election. To do this would be to sacrifice substance to form ; to make the incident of a thing of more consequence than the thing itself. More evils, it is believed, will result in allowing clerical returns to control and decide elections, than in allowing the votes of the people to control and decide them. When a man seeks to put another out of office, and put himself in, by contest, as in this case, he must show that he has received a majority of the legal votes for such office ; it is not enough for him to show that A., B. or C. has made some mistake about the returns, or that there is a chance of his being elected. The fact of his election must affirmatively appear. There is not a particle of evidence in this case to show that Kent had more legal votes for sheriff of Douglas County than Day ; but all the evidence

Day v. Kent.

we have upon the subject proves the contrary, and that Day's majority over Kent for said office was twenty-one votes. Our statute says, that courts shall determine such contests as this in a manner "to carry into effect the expressed will of a majority of the legal voters, as indicated by their votes, not regarding technicalities or errors in spelling the name of any candidate for office." Effect is to be given to the will of the majority, as expressed by their "votes," and not as it appears from the returns. Courts, in cases of this kind, are not bound by the acts or decisions of canvassing officers, but are to hear parol or other competent evidence, and then give the office to him who appears to have a majority of legal votes for it. This conclusion seems to harmonize with the theory of our government and the substantial requirements of the law. Let the judgment be reversed, and a certificate of election be issued to-day.

Judgment reversed.

DEADY, J., dissented, by the following opinion :

The determination of the question, who is legally entitled to the certificate of election in this case, is a matter of secondary moment. However decided, the effect in this particular instance will be but transitory, and cannot extend beyond the existing term of the office about which the controversy arises. A majority of the court have decided the question in favor of the plaintiff in error. Although I differ from the majority in their reasoning and conclusions, from beginning to end, yet, if the decision in its consequences ended with this case, I could be content to dissent in silence. But the doctrine now sought to be established, and armed with the authority of *stare decisis*, extends in its consequences beyond this occasion into the future. The principles involved in this case are of vital importance to the well-being and peace of a community like ours. The genius of our institutions, and the tendency of the age, combine to make the polls the final arbiter of all questions involving a choice of public

agents, or public policy. From this tribunal there is no appeal; and however repugnant to the feelings, or adverse to the interests of the minority, may be its decisions, they must yield it submission, or raise the arm of rebellion and anarchy.

Experience has shown that, in times of public excitement and desperate party strife, all manner of nefarious devices and expedients are frequently resorted to for the purpose of improperly affecting the result of the election. To preserve, then, unimpaired the authority and usefulness of the polls, must be among the most important duties of the law-making power. Accordingly, we find that the legislature of the various States, as well as that of our own territory, have from time to time, as experience demonstrated their necessity, enacted laws intended and calculated to guard the purity and secure the correctness of the polls, by decreasing, as far as possible, the temptations and opportunities for fraud and mistake.

These laws are two-fold in their character—preventive and remedial. The remedial are such as provide a remedy or mode of proceeding, by which the result of the election, in any particular, may be scrutinized or contested, whenever it is conceived that it is vitiated by fraud or illegality; but by far the most important and useful of those regulations are the preventive. Without them, an election would be unworthy of the name, and degenerate from a law-appointed and law-regulated proceeding into a mere voluntary assemblage, where the right of the elector, the manner and evidence of the exercise of that right, would be governed and protected by no more certain and just rule than the caprice of the hour, or the interested and uncertain passions of the greater number.

Upon this subject the Code of Oregon, after providing for the public notice of elections, the number and manner of selecting judges and clerks, substantially enacts, that the clerk of the county commissioners shall furnish one of the judges of the election with two poll-books, at least five days

before the election; that the judges and clerks of the election, before receiving any votes, shall be sworn to "studiously endeavor to prevent fraud, deceit and abuse in conducting the same;" that the person administering such oaths shall cause an entry thereof to be made and subscribed by him, and prefixed to the poll-books; that the elector shall in full view deliver his ballot to one of the judges of the election; that said judge shall, upon the receipt thereof, pronounce, with an audible voice, the name of the elector; and if the name be received, " the clerks of the election shall enter the name of the elector and number in the poll-book." After the polls are closed, the canvass shall be made by a comparison of the poll-lists, containing the names and numbers of the electors, until they shall be found or made to agree; that the ballots shall then be counted, unopened, except so far as to ascertain whether each ballot is single; that if the number of ballots shall exceed the number of votes on the poll-list, "one of the judges shall publicly draw out and destroy therefrom so many ballots unopened as shall be equal to such excess." After this, the votes are to be counted, writing in the poll-book the name of each person voted for, and the number of votes he received; to which shall be attached a certificate of the judges and clerks, certifying the same to be correct. This constitutes the return. One of these poll-books, containing this return, is to be sent, under seal, to the clerk of the county commissioners; the other, with the ballot-box, to be deposited with one of the judges of election, "subject to the inspection of any elector, at any time thereafter, who may wish to examine the same." In case of a contest for any county office, after the proper preliminary proceedings, the same shall be tried by the District Court, or the judge thereof at chambers; the court shall hear and determine (without the intervention of a jury) the same, in such manner as shall carry into effect the expressed will of a majority of the legal voters, as indicated by their votes, for such office, not regarding technicalities, or errors in spelling the name of any candidate for such office.

The only question for determination in this case is the legality of the election said to have been held in Cow Creek precinct. No other evidence exists of an election having been held there than is furnished by the certificate of certain persons professing to act as judges and clerks of the election at that place. This certificate asserts that, at an election held in that precinct, certain persons received a certain number of votes for certain offices; and, among others, that the plaintiff in error received for the office of sheriff twenty-three votes. Although not technically correct, it is substantially such a return as the law contemplates. It is the statement of the judges and clerks that an election was held, and their conclusions as to what was the result. But whether these persons, professing to be judges and clerks of election, have stated the facts in these particulars, does not appear, because no poll-book has been returned, nor is there any evidence that one was ever kept. The poll-book is the record of the election. In it, and it only, is to be found the oath of office of the judges and clerks, the names and number of the voters, the challenges made, whether allowed or disallowed, and all the other separate facts which transpire at and constitute an election. This statement, certificate or return, if made with authority, is drawn from the poll-book, and the poll-book should accompany it; so that any errors of calculation that appear upon its face may be corrected by it; but in this case no poll-book exists, no list of the voters' names was kept, no record of the oath of office appears, and there was nothing remaining, or, rather, ever existed, from which they could certify any thing. How, let me ask, did these judges and clerks ascertain that these supposed ballots, to which they have certified, agreed with the number of electors who voted at that election? Certainly they did not ascertain it in the way in which the law requires, by comparing the number of such ballots with the number of voters upon the poll-books; for that was a physical impossibility, as no such thing as a poll-book existed. What assurance had they, have we, or has the defendant in error, that while twenty-three ballots might

Day *v.* Kent.

have been found in the ballot-box for Day, they were not given by only ten electors, or any number less than twenty-three. In this case, as a matter of fact, no such fraud may have been practiced. It is not alleged by the defendant in error whether it was or was not; nor, as a matter of fact or law, can it be presumed that any one knows it.

But the law founded upon experience presumes that such devices will be practiced, and the defendant in error is entitled to have that security against such contingencies that the law has provided ; that is, a comparison of the poll-list (kept name by name publicly, as the election progresses) with the ballots before the votes were counted. If a fraud has been practiced in this particular, (and if it was, the judges and clerks would not likely have been aware of it, for they had no means of detection,) the defendant in error would be almost powerless to detect and expose it. It could not be done without an exact knowledge of the number of voters. How is that to be obtained, when no record was kept of them ? Whose business is it to stand by and keep count, and remember it, and if it were any one's, whose memory could be relied upon with any degree of certainty for such information ? especially in a precinct that would cast a thousand votes, an event not uncommon in densely populated neighborhoods. But to go further. Suppose it were true that twenty-three ballots were given at Cow Creek for the plaintiff in error, ten, or any number of them less than twenty-three, may have been given by persons not electors of the county.

The judges and clerks are not bound to know that every man who votes is qualified, nor is it possible that they can. But the law, founded upon experience, presumes that illegal votes may be thrown, and therefore it has provided that a poll-book be kept, the simple inspection of which will determine *who did* vote at a given election. The leading fact being known without doubt, a party who has been injured by illegal votes being cast against him, is enabled to show the fact. Besides, to vote illegally, knowing the same, is a criminal offence, and therefore it is important that a poll-book be kept.

But, as in this case, if no poll-book were kept, how could the defendant in error, or any one else, ascertain whether illegal votes were thrown or not, and if so, how many and by whom.

The first step to be taken in the matter is to ascertain who did vote ; this, by the security which the law has provided for him, the defendant is entitled to know from the poll-book ; but by the decision of a majority of the court, it depends upon whether the judges of election see proper to keep a poll-book or not.   If, through ignorance, negligence or corruption, they omit to keep a poll-book and return it, the burden of their ignorance or corruption must fall upon him.   If they certify that A. B. had twenty-three votes, or one thousand, he must find out *who* gave them the best way he can ; and if he cannot, as in most instances he could not, of course he is practically concluded from showing their illegality, although, in point of fact, one-half of them might have been so.

It is said, however, that the court is to disregard " technicalities " in the decision of this case ; true, so the Code declares, but in the same sentence, by a *particular expression*, is defined in what sense the word technicalities is here used. The whole expression is, " not regarding technicalities or *errors in spelling the name of any candidate for such office.*" To my mind the inference is absurd, that because the law commands the court to disregard *such* " technicalities" as error in the spelling of a candidate's name, that therefore the judges and clerks need not be sworn, that therefore there need be no list of the voters' names, that therefore there need be no comparison of the poll-lists and the ballots before counting the votes; in short, that therefore all the security and guard which the law has thrown around the poll is merely so much parliamentary advice to the judges and clerks of election, which, whether they follow or not, shall make no sort of difference with the result.

Again, it is said that the court is to regard the *will* of the majority as indicated by their *votes*.   The argument which has been drawn from this partial statement of the law, if it proves any thing, proves too much.   That *will* of the ma

Day *v.* Kent.

jority must not only exist, but it must be *expressed*, and that
substantially in the mode designated by the law.  If the
elector were to vote *viva voce*, he would express his will, but
not in such a mode as would authorize the court to consider
it, because the law directs that his will shall be expressed by
ballot.  In this case, the record containing no evidence of
what is known to the law as an election in Cow Creek pre-
cinct, then, although the majority of the voters of that pre-
cinct, if such an election had been held, would have willed
the election of Day, there is no expressed will upon the sub-
ject.  But it is said, the omission to keep a poll-book and
return is the neglect of the judges and clerks, and the voters
of that precinct should not be prejudiced by such neglect;
that when the elector deposits his ballot he is entitled to have
it received by the county canvassers, no difference what may
occur by reason of the ignorance, negligence, or corruption
of the officers who hold the election.  This argument is liable
to the objection that it assumes the fact in question, that is,
that there were legal voters in Cow Creek precinct, and that
they did deposit their ballots at an election therein for the
plaintiff in error.  Of all this there is no legal evidence in
this record.  No. parol evidence has been taken; the certifi-
cate of those persons professing to be judges and clerks is of
no effect, because nothing appears from which they could
certify such result, or any other.  But if it were otherwise,
the doctrine is erroneous, and is subversive of the true prin-
ciples which lie at the foundation of the proceeding known
as an election.  All the regulations which the Code prescribes
for holding elections are not merely directory to the officers.
Some of them, I admit, are, and should be so held, but others
are of the very essence and substance of the proceeding, with-
out which it can have no effect.  The rule which distinguishes
between the statute that is directory and that that is not,
though frequently difficult of application, is in itself simple
and plain.

For instance: the Code directs that the clerk of the county
commissioners shall furnish the judges of election with two

poll-books, five days at least before the election.   The object of this statute is to secure poll-books properly prepared for the records of the election.   As the most convenient method of securing this end, the clerical officer of the county is directed to furnish them.   But suppose he omit to do so, and the clerks of the election provide themselves with poll-books, and the election proceeds in all respects as if the statute had been obeyed by the auditor.   This provision is directory, and a neglect to obey it by the auditor would not vitiate the election, provided the poll-books were obtained in some way and used.   The result, in all respects, would be the same.   But a poll-book, containing a list of the electors, and their numbers, bears a very different relation to the main object to be accomplished, to wit, an election.   Without something substantially conforming to it, there is no legal evidence that the event transpired, although there might be an assemblage of persons qualified to vote, and an individual expression of opinion upon some question to be decided at that election.   If the poll-book can be dispensed with, then a collective expression of the will of the voters of the precinct may also be dispensed with, and each individual voter may send his vote by mail, or otherwise, direct to the county canvassers.   The necessity of the poll-book is not to be determined altogether with reference to the interests and rights of the supposed electors of Cow Creek precinct.   The election is a public proceeding, in which the whole public have an interest, carried on at different places all over the territory at the same time.   These twenty-three votes, purporting to have been thrown at Cow Creek for Day, if counted, negative the expressed will of twenty-three legal voters in some other portion of Douglas County, say in Deer Creek precinct.   Now, the twenty-three voters of Deer Creek precinct have a right to demand that, before the same number of voters shall be counted from Cow Creek precinct, negativing their legally expressed will, the legal evidence that an election was held at the latter place should exist and be produced.

It is said that although these provisions of the law are di-

Day *v.* Kent.

rectory, and may be obeyed or not at pleasure, without affecting the result, yet there is sufficient security against fraud or mistake in the fact that the election is held openly and publicly, and that the judges and clerks, five in number, are sworn to "studiously endeavor to prevent fraud, deceit and abuse in conducting the same." By the same oath they are bound to conduct the election "according to law;" yet, according to the doctrine of the majority, this part of the oath is only directory, and whether kept or not will not vitiate the election. For the same reason so much of the oath as relates to "fraud, deceit and abuse" may be considered directory by the judges and clerks, and kept or not at pleasure. But this security against fraud and mistake, which is found in the publicity of the transaction, and the oaths of the officers, under the doctrine now established, is a mere mockery. The judges and clerks may omit to take the oath, the statute requiring them to be sworn being only directory. They may hold the election with closed doors, the statute requiring publicity is only directory. The voter is not to lose his rights upon account of these omissions, and so the election is left to the caprice of those who hold it. If illegal votes are received, quite likely no one remembers who gave them, no record has been kept of the voters' names, and, until this becomes known, no steps can be taken to show their illegality, or even to ascertain the fact that they were illegal.

To be certain, then, of any security from fraud or mistake, or to have the means of its detection, if made, there must be some limit to what is directory, something must be imperative. In *Kneass' Case, page* 581, *Parsons' Select Equity Cases,* Judge King says: "the manner of receiving and recording votes is also prescribed, and the procedure in this respect demanded by the law is most important to the prevention of fraud." Again, he says of the same duty, "this direction is among the vital provisions of the law, which no inspector, disposed faithfully to execute his duty, ought to omit, and the absence of which must tend to make the conduct of the election suspicious, if not absolutely illegal."

For these reasons, I conclude that the law requiring the clerks to keep a list of the names and the number of electors, is not merely directory, but absolute and imperative. That it is of the very substance of the thing to be done as the election proceeds, forming a vital and substantial part of the proceeding. To hold otherwise, would open a wide door to fraud, controversy and dispute, that could only be settled by a resort to the uncertain and contradictory memory of judges, clerks and bystanders—the very evil which this provision is intended to guard against. And if, in this particular instance, this instruction of the law would operate to exclude votes which were actually given in good faith, it is a misfortune which the parties must submit to for the time being. Mistakes are of daily occurrence in human affairs; and if the law were to be lengthened or shortened to meet each particular case, it would beget more confusion than it would correct.