## HENRY VAN GIESON v. J. ALFRED MAGOON.

### EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

ARGUED APRIL 22, 1910.                    DECIDED MAY 4, 1910.

### HARTWELL, C.J., PERRY AND DE BOLT, JJ.

*Contracts—construction.*

The agreement of the defendant with the plaintiff required him to defend the plaintiff's case to the court of last resort to which the same might be appealed.

*Champerty and maintenance—agreement of an attorney at law to defend a case for a share of the property involved in it.*

Such an agreement is not illegal or void by the law of Hawaii.

*Attorney and client—refusal to accept attorney's advice to compromise.*

An attorney is not discharged from an agreement to defend his client's case by the client's refusal to accept the attorney's advice to compromise.

Van Gieson v. Magoon, 20 Haw. 146.

*Evidence—reasonableness of attorney's fees.*

The reasonableness of fees charged by an attorney must be shown by evidence in addition to a showing of the kind of service performed.

## OPINION OF THE COURT BY HARTWELL, C.J.

This was an action to recover $626.07 expended by the plaintiff for costs and attorney's fees in the appeal to the United States supreme court from a decree in this court in a suit in equity brought against him by one Maile to obtain a reconveyance of certain land that plaintiff had bought at an execution sale. The plaintiff appointed the defendant as his attorney in the suit and made an agreement with him October 19, 1906, that the defendant, in consideration of the plaintiff's conveyance to him of a portion of the land, would defend the suit and pay the costs. The decree made by the trial court in favor of Van Gieson was reversed by this court. The defendant declined under his agreement to appeal the case to the United States supreme court, whereupon the plaintiff engaged another attorney for the purpose paying $309.42 attorney's fees, $313.10 costs of court, $22.50 for printing brief and $7.05 for cabling in the case. The defendant paid only $25 of the costs on appeal. The plaintiff claimed at the trial that the agreement was ambiguous or equivocal in its expression of the duty of the defendant to attend to an appeal from the decree of this court, and for that purpose introduced parol testimony tending to show that the defendant admitted that it required him to do this. The jury rendered a verdict for the plaintiff for the amount claimed. Exceptions were taken by the defendant to the admission of the evidence explanatory of the written agreement, denial of his motion for a directed verdict, refusal of the court to instruct the jury in accordance with his theory of the case, namely, that the agreement was unambiguous and clear, requiring no appeal by Van Gieson to be taken

beyond this court to the instructions given to the effect that the evidence was admissible in order to explain an "equivocation" which the court found in the agreement, and to denial of motions for judgment non obstante and for a new trial.

The defendant submits that the agreement is void for champerty. This was presented as one of the grounds of the motion for judgment non obstante. It appears to be of a champertous nature which would make it illegal and void at common law. In *Mossman* v. *Hawaiian Government,* 10 Haw. 421, 434, 435, 436, the court held that it "is at least questionable" whether a conveyance by a disseizee to a third party is void as to the disseizor by the common law of England as ascertained by English and American decisions, but that "the doctrine contended for, if common law, is within the exception of the statute as otherwise fixed by Hawaiian judicial precedent or established by Hawaiian national usage." In *Pechell* v. *Watson,* 8 M. & W. 690, the syllabus mentions maintenance as "a wrongful act at common law," and the statutes relating to maintenance as "declaratory of the common law," but this statement does not appear in the opinion. "It has always been considered, however, that champerty and maintenance are offences at common law and that the statutes only declare the common law, with additional penalties (*Pechell* v. *Watson* (1841), 8 M. & W. 691; *Partridge* v. *Strange* (1552), Plowden, 77, 88)." Laws of England (1 Halsbury) 52. "This was an offense at the common law." 2 Coke's Littleton, 368. b. The *Mossman* case may, however, rest safely upon the ground that the common law on the subject of livery of seizin never prevailed here. It was said in *Henrique* v. *Paris,* 10 Haw. 408, 413, with reference to the common law rule of the non-assignability of a right of entry: "There is not now and here the necessity that there was in England in the Middle Ages for laws against champerty and maintenance to prevent the stirring up of suits for purposes of oppression, nor any

reason why a landlord should not convey his estate without the consent (attornment) of his tenant. Freedom rather than restraint of alienation is required under present conditions. The reasons for this rule having ceased, the rule itself should also cease." Since that decision non-negotiable choses in action have been made assignable by statute. Sec. 1739 R. L.

The conditions of society under which the law of maintenance and champerty originated no longer exist. The common law of England is declared to be the law of Hawaii "except as otherwise expressly provided by the Constitution and laws of the United States, or by the laws of the Territory of Hawaii, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage." Sec. 1 R. L. That portion of the law of champerty which relates to the assignability of choses in action and conveyances by disseizees is otherwise provided for and fixed by precedent and usage and in part by legislation.

The contract is not unlawful because against principles of law in force here, nor is it a contract to do anything which is prohibited by statute or which is immoral. There is no generally acknowledged public policy against such contracts. Probably more frivolous and groundless suits are brought without any agreement for attorney's fees than under such agreements. If an attorney undertakes to pay the costs he is more likely to do so in a meritorious case than in one devoid of merit. If he takes advantage of his superior knowledge and of the client's poverty to obtain an unfair arrangement for sharing in the proceeds of the litigation the client's remedy at law or in equity is ample.

It is not the practice of attorneys of recognized standing to encourage frivolous litigation. We believe that the "ambulance attorney" is not yet in evidence here and it is to be hoped that he never will be. But the promoter and stirrer up of strifes may at any time exist and is not abated by laws of maintenance and champerty.

The objection to the agreement that it is illegal and void for champerty is not sustained.

We will next consider the meaning and legal effect of the agreement which is worded as follows:

"That said Van Giesen hereby appoints said Magoon and such persons as he may substitute for him or associate with him, attorney or attorneys in the case of C. B. Maile against said Van Giesen and another now pending in the circuit court of the first judicial circuit.

"In case said suit is decided in favor of said Van Giesen in the court of last resort to which the same may be appealed, he shall deed to said Magoon all of the land on Alakea street in Honolulu, Oahu, purchased inter alia by him at sheriff's sale on judgment recovered for taxes against said Maile, said land to be free from all encumbrances made or suffered by said Van Giesen; and upon the delivery of said deed to said Magoon, he shall pay the said Van Giesen five hundred and thirty-five dollars with interest thereon at the rate of eight per cent per annum from the 5th day of July, 1904. Said Van Giesen is to forthwith execute a deed of said land to said Magoon and deliver the same to J. Lightfoot, he to hold it in escrow until the termination of said suit. And in case it shall be terminated in favor of said Van Giesen, to deliver to said Magoon said deed upon the payment by him of said sum of five hundred and thirty-five dollars with interest thereon as aforesaid.

"Said Magoon is to defend free of charge said pending suit and any other suit that may be brought by said Maile or any one claiming under him, and in case judgment shall be against said Van Giesen, shall appeal the same to the Supreme Court of this Territory, and in case judgment shall be in favor of said Van Giesen in the trial court and shall be appealed by the adverse party, said Magoon shall defend such suit to the court of last resort to which the same may be appealed. Said Magoon is to pay all costs of court that shall accrue after this date against said Van Giesen in said pending suit.

"Said Magoon agrees in case said pending suit shall be finally decided in favor of said Van Giesen to pay to said Van Giesen three-quarters of the rents now due from said Magoon, on account of said land, provided said suit shall not be appealed further than to the Supreme Court of the Territory of Hawaii,

and one-half of such rents in case said suit shall be appealed to the United States Supreme Court.

"Said Magoon agrees to pay the mortgage notes for three hundred and fifty dollars and one hundred and sixty dollars heretofore given by said Van Giesen and take an assignment of said notes and the mortgages secured thereby in case the mortgagees shall attempt to force payment of the same provided said Van Giesen shall keep the interest of said mortgage promptly paid; and in case of such assignment to said Magoon, he will hold the same, provided the interest shall be paid as aforesaid until the final determination of said pending suit."

The plaintiff's object in entering into this agreement was to hold the title obtained at the execution sale as against the claim of Maile "or any one claiming under him," and the defendant was interested in securing for the plaintiff this land of which he was to have a part deeded to him by the plaintiff for the professional services of himself "and such persons as he may substitute for him and associate with him" in defending the suit and for "all costs of court that should accrue against Van Gieson in said pending suit," which the defendant was to pay. Under such circumstances an agreement to defend the suit generally would not be limited to its defense in the trial court. In other words, this would not be like a retainer for that court only requiring a further retainer on appeal whether by one side or by the other. There is no reason why in an agreement to defend the suit the defense should stop with an adverse decree in this court any more than with an adverse decree by the trial court. There is nothing in the prior or subsequent parts of the agreement which limits the defense to any court in which it could be made. The provision requiring an appeal to this court from a judgment against Van Gieson and that Magoon shall "defend such suit to the court of last resort to which the same may be appealed," if Van Gieson should obtain judgment in the trial court and Maile should appeal, does not limit the defense to those instances, especially when the

object of the entire agreement is considered and that Magoon agreed to pay all costs that should accrue against Van Gieson. To defend a suit means in popular and well understood phrase to take care of it in court. One who is not an attorney at law would take care of or defend a suit by engaging an attorney to do all that the law authorizes him to do in caring for the interests of the party whose rights in the suit are entrusted to his care. This is not done without resorting to the customary methods of asserting such rights whether by appeal, writ of error or exceptions. If the parties intended that the suit should not be fully defended such intention should have been expressed by a provision that the attorney would defend the suit in the trial court and in this court only. The requirement of an appeal to this court by Van Gieson and of a defense "to the court of last resort," in case of an appeal by Maile, does not imply that an appeal would not be taken by Van Gieson from an adverse judgment of this court. By the agreement Magoon was to pay Van Gieson three fourths of the rent then due on account of said land "in case said pending suit shall be finally decided in favor of said Van Gieson," if the suit should "not be appealed further than to the supreme court of the Territory of Hawaii, and one-half of such rents in case such suit shall be appealed to the United States Supreme Court," plainly contemplating an appeal to the court of last resort. Magoon's agreement to pay Van Gieson's mortgage notes for $510 and take an assignment of them and of the mortgages if the mortgagees should attempt to force payment, conditioned upon Van Gieson keeping the interest paid, required and authorized him to "hold the same provided the interest shall be paid as aforesaid until the final determination of said pending suit," another recognition of the fact that a final appeal was contemplated. These provisions are equally applicable to appeals to the United States supreme court by Van Gieson as by Maile.

Magoon agreed to defend the suit against Van Gieson, which

is described as the one which was pending in the circuit court of the first judicial circuit, Van Gieson deeding to him a portion of the land for which the suit was brought, the deed to remain in escrow until the termination of the suit. Magoon was to defend free of charge that suit and any· other which might be brought by Maile or any one claiming under him, and (1) if Van Gieson should lose in the circuit court he was to appeal the case to the supreme court of the Territory, and (2) if Van Gieson should win in the circuit court and Maile appeal Magoon was to defend it to the court of last resort to which the case might be appealed, namely, the United States supreme court. The contingency of Van Gieson winning in the circuit court and Maile appealing to the territorial supreme court implies that Maile might win and Van Gieson appeal to the United States supreme court. If, however, Van Gieson should win and Maile appeal to the United States supreme court would Magoon's agreement to defend the suit not require him to defend it in Washington? It is difficult to see how the case could be defended if the defense should be confined to the instances enumerated above.

Taking into consideration then the object of the agreement and of its provisions we think that it required Magoon to conduct Van Gieson's appeal to the supreme court of the United States ·and to pay all the costs of court therein. This view of the agreement dispenses with consideration of the admissibility of evidence to explain its meaning or of the correctness of the instructions given in the view that the agreement contained an "equivocation," since the error of admitting the evidence and giving the instructions was not prejudicial to the defendant, for the only alternative would have been, upon rejecting the evidence, to instruct the jury that the agreement required the defendant to conduct ·and pay the expense of the appeal. It follows that the instructions on the parol evidence rule asked by the defendant were properly refused.

The defendant claimed that he was released from any agreement to conduct an appeal to the United States supreme court by reason of the plaintiff's refusal to take his advice to accept a compromise of $1800 offered by Maile. But the duty of an attorney to carry out an agreement to defend a case is not discharged because his advice to compromise it is not taken.

The defendant further claimed that there was no evidence of the value of the services of the attorneys engaged by the plaintiff. The plaintiff's right was to engage another attorney to perform the service which the defendant had agreed but declined to perform and the defendant would be liable for any reasonable expenditure incurred for the purpose. The reasonableness of the attorney's fees would not be determined by the result of the case nor be affected by a showing that another attorney would have charged a lower fee.

The declaration is in code form and its caption does not set forth the name of the action, indebitatus assumpsit, upon the defendant's agreement, implied by the law, to recoup the plaintiff for his reasonable expenditure in securing the agreed defense. It was not a question of the value of the professional services for which the plaintiff paid, but simply whether they were reasonable in amount. In addition to the showing of their payment and of the kind and nature of the service performed, namely, preparing a brief in the case, it was requisite in the opinion of a majority of the court that there should be evidence that the fees were appropriate for such services.

Unless the sums paid for attorney's fees, amounting to $300, shall be remitted by the plaintiff within five days a new trial is granted. The exceptions relating to the fees are sustained.

Lorrin Andrews for plaintiff.

A. S. Humphreys for defendant.

### CONCURRING OPINION OF PERRY, J.

I concur in the foregoing opinion, but on two of the subjects under consideration shall state more at length my reasons for my concurrence.

Defendant's undertaking was that he would conduct the case for Van Gieson in the suit of *Maile* v. *Van Gieson* (whether he so undertook to appear until the final disposition of the case in the supreme court of the United States or only until a decision by the supreme court of the Territory is immaterial in this connection) and to pay all of the costs of the suit,—to lose all of such expenditures of money as well as his efforts and services in the event of an adverse judgment and in the event of success to receive as compensation for his services and for the risk incurred in the payment of expenses a portion of the land involved in the original suit.

Champerty and maintenance have been variously defined in the books, ancient as well as modern. Courts and text writers seem to have found some difficulty in stating precisely what they consisted of in England. Perhaps the following definition comes as near as possible to stating the generally accepted view on the subject. Champerty (campum partire, to divide the land) is "a bargain with a plaintiff or defendant in a suit for a portion of the land or other matter sued for in case of a successful termination of the suit which the champertor undertakes to carry on at his own expense."—Bouvier. Maintenance is "a malicious or at least officious interference in a suit in which the offender has no interest, to assist one of the parties to it against the other with money or advice, to prosecute or defend the action without any authority of law."—Bouvier.

There were old English statutes defining champerty and maintenance and making them punishable offenses. Whether or not and to what extent champerty and maintenance were offenses under the unwritten law of England existing prior to the enactment of those statutes is a matter upon which the authorities are not agreed or at least some doubt is expressed here and there that they were offenses. The supreme court of the United States, in *Peck* v. *Heurich,* 167 U. S. 624, 629, 630, said: "According to the common law as generally recog-

nized in the United States, wherever it has not been modified by statute, and certainly as prevailing in the District of Columbia, an agreement by an attorney at law to prosecute at his own expense a suit to recover land in which he personally has and claims no title or interest present or contingent, in consideration of receiving a certain proportion of what he may recover, is contrary to public policy, unlawful and void as tending to stir up baseless litigation." The preponderance of authority is, perhaps, to the effect that the rule was a part of the unwritten law of England. However that may be, it may, in view of our conclusion that these provisions of the common law, whether unwritten or statutory, are not, as such, in force in this Territory, be assumed for the purposes of this opinion that the rule was a part of the unwritten law.

So, also, for the same reason, it is unnecessary to determine in this case whether the "common law" of England which by Sec. 1 of the Revised Laws is made law in Hawaii includes early English statutes such as those mentioned above. In *Rooke* v. *Queen's Hospital,* 12 Haw. 375, 380, the court suggested the possibility of the question but expressed no opinion upon it. No definite decision upon it has been rendered as far as I know.

Before considering whether or not the common law of England relating to champerty and maintenance in general and to contracts such as that under consideration in particular is by reason of the provisions of Sec. 1 of the Revised Laws in force in this Territory, it may be well, assuming for the moment that such is not the case, to consider whether as a matter of public policy such contracts ought to be declared void.

In olden England such contracts were deemed to be contrary to sound public policy because it was believed that if they were permitted the result would be to encourage and facilitate the stirring up of unworthy litigation. Various considerations contributed to this view. In the first place, judges as a rule

were more or less corrupt and the administration of justice was in disrepute. It was believed that powerful lords could and did control the judges and influence judicial decisions in their favor irrespective of the merits of controversies. The position of attorneys, too, was materially different then from what it is now. They were not supposed to receive any compensation as such for their services but merely an honorarium or gift at the option of the client. Attorneys could not demand or expect to receive pay as a matter of right. They were not permitted to make any contract whatsoever with their clients. It was deemed to be for the best interests of the community that the powerful lords owning large landed estates should continue in the ownership and possession of such estates and that others should not acquire title to any part of such property. The discouragement of litigation against the lords was for that as well as for other reasons regarded as desirable. The assignment of choses in action was also prohibited. It was largely for these reasons that the rule grew up and was finally embodied in statutes prohibiting any sort of intermeddling in the law suits or causes of action of others. The discouragement in the beginning went as far as to prohibit an offer voluntarily to testify in a pending suit, aid to a litigant to find a lawyer, and friendly advice to a neighbor as to his legal rights (*Gilman* v. *Jones,* 5 So. 785, 787), as well as the furnishing of money for the conduct of the suit and the undertaking to bear the expenses and to furnish professional services as attorney in consideration of a division of the amount to be recovered.

In some of the states, by reason of provisions of their fundamental laws, the common law rule on this subject has been declared to be the law in those jurisdictions. In still other states where the common law has been held as such not to be in force, the same rule in milder and modified form has been declared to exist as a requirement of public policy. In these the argument generally indulged in is, in brief, that to permit

attorneys to make such contracts is to facilitate litigation, to encourage the bringing of groundless suits and to compel defendants to make unjust compromises. In the older English decisions the attorneys so conducting suits are referred to as "pests of society" ( 4 Blackstone's Com., p. 135) and the reasoning in the class of American decisions last referred to seems to proceed very largely upon the view that attorneys are such pests and unworthy of a reasonable amount of confidence and trust.

This reasoning does not appeal to me. I recognize that a majority, perhaps a great majority, of the state courts have taken the view that such contracts are contrary to public policy. *Key* v. *Vattier,* 1 O. 132, 143; *Boardman* v. *Thompson,* 25 Ia. 487; *Adye* v. *Hanna,* 47 Ia. 264; *Gammons* v. *Johnson,* 76 Minn. 76; *Moreland* v. *Devenney,* 72 Kans. 471; *Thurston* v. *Percival,* 1 Pick. 415; *Martin* v. *Clarke,* 8 R. I. 389, 401; *Re Evans & Rogers,* 22 Utah, 366; *Allard* v. *Lamirande,* 29 Wis. 502; *Hamilton* v. *Gray,* 31 Atl. (Vt.) 315; *Lytle* v. *State,* 17 Ark. 609, 663; *Gilman* v. *Jones,* supra. I prefer the reasoning of the minority. *Hassell* v. *Van Houten,* 39 N. J. Eq. 105, 109; *Schomp* v. *Schenck,* 40 N. J. L. 202; *Manning* v. *Sprague,* 148 Mass. 18, 20; *Bentinck* v. *Franklin,* 38 Tex. 458, 472-474; *Mathewson* v. *Fitch,* 22 Cal. 86, 94; *Reece* v. *Kyle,* 49 O. St. 475, 480-488; and, particularly, the brief of plaintiffs' attorneys in *Key* v. *Vattier,* 1 O. 132, 135-142. The latter appeals to me as being sound and more in keeping with the progress of society in general and of the administration of justice in particular, and with the development of commerce which has ensued since the days in which the rule had its origin. There is nothing inherently wrong or immoral in such contracts. They are not mala in se. The feudal system no longer exists. There is no class of powerful lords on the one hand and of ignorant poor on the other in danger of being crushed. The administration of justice is in safe hands and any abuse

Van Gieson v. Magoon, 20 Haw. 146.

of judicial power is now the rare exception. If a suit is groundless the court will easily ascertain that fact and fearlessly declare it. Attorneys have long been regarded as entitled to a reasonable compensation for their services and to the right to sue for the same and, subject, perhaps, to certain limitations, to contract generally with their clients. Purely contingent fees are now regarded in many jurisdictions as legitimate. *Perry v. Dicken,* 105 Pa. St. 83, 89; *Jewell v. Neidy,* 61 Ia. 299, 300; *Dockery v. McLellan,* 67 N. W. (Wis.) 733, 735. The supreme court of the United States so regards them, at least in proceedings against the United States government or before some of its departments. *Taylor v. Bemiss,* 110 U. S. 42, 45. Choses in action are now assignable by statute in many jurisdictions and so, also, in Hawaii. R. L., Sec. 1739. The view has, of course, been long since exploded that a stranger may not legitimately aid a litigant by furnishing him with evidence or by appearing as a witness without a subpoena. Reputable members of the bar everywhere enter into contracts for compensation contingent upon the success or the failure of their clients and do so without reproach from themselves or from others. It is, indeed, unfortunately true that some attorneys there are in every community who abuse their privileges and would abuse this privilege to make such contracts and who, making them, would bring groundless suits and stir up baseless litigation, but, on the other hand, it is also true that there are many persons financially poor, and I think that this constitutes by far the larger class, who have worthy causes of action, and who would wholly fail to obtain redress for their grievances if they were not at liberty to enter into contracts such as this with attorneys. Whether the motive of the attorney in entering into the contracts be purely the prospect of personal gain or be purely a desire to aid the weak or is both is immaterial. When we consider whether or not public policy requires the invalidating of all such con-

tracts we must weigh the advantages and disadvantages of freedom of action, and I think that in this instance the advantages far outweigh the disadvantages.

Among the reforms in England and in this country occurring since the date of the acts relating to champerty and maintenance "may be mentioned the enactment of the statutes for the limitation of actions, the statute of frauds, the extension of the action for malicious prosecution and that for awarding costs against unsuccessful parties. These changes have contributed materially to the discouragement of groundless and vexatious litigation." *Reece* v. *Kyle*, 49 O. St. 475, 483.

If it is lawful for an attorney to conduct litigation upon a contract for purely contingent fees without agreeing to advance the cost of the litigation, if, in other words, liberty to make such an agreement does not tend to unduly encourage litigation, how much more true, it seems to me, that litigation is not encouraged where the attorney in addition undertakes to bear all the costs and expenses of the proceedings. In the latter instance he is running the risk of losing not only his own services but also his cash outlays, and this necessarily adds responsibility and tends to make him more cautious before advising his client to enter suit or to continue the proceedings. Even unscrupulous attorneys would ordinarily be moved by this consideration not to enter into the prosecution of a groundless claim or defense.

Again, this is an agricultural community. A large number of our population is composed of laborers, poor in this world's goods, who at times receive bodily injuries in the course of their employment caused by the negligence of their employers. With them the denial of the right to enter into such contracts will often mean a denial of a remedy for their just grievances. Our courts are so administered that, I believe, unscrupulous lawyers will find but little encouragement for the prosecution of groundless claims, and defendants, more often

the wealthier parties to actions, will not feel constrained to enter into unjust compromises. They may well feel confident that upon allowing the adverse claim to be presented to our judicial tribunals the latter will, if the claim be not meritorious, readily say so and award judgment in favor of such defendants. On the other hand, if the claim be meritorious, by all means let it be presented to the courts even though a part of the proceeds will finally go to the attorney and not to the client. Commercial transactions in this age are becoming more numerous and more highly favored. The right to contract with reference to every species of property has undergone large development since early days and is now better understood and more highly valued.

The right to make contracts of this particular kind should not be abridged or denied on any ground of public policy unless there is an evil clearly calling for a remedy. In my opinion there is no such evil, and therefore no justificaton for the declaration that such contracts are void as being contrary to public policy.

Let us return now to the second question above mentioned as to whether or not the common law rule is in force in this jurisdiction. Sec. 1 of the Revised Laws declares in part that "the common law of England as ascertained by English and American decisions is hereby declared to be the common law of Hawaii in all cases except as otherwise provided by the constitution or the laws of the United States or by the laws of the Territory of Hawaii or fixed by Hawaiian judicial precedent or established by Hawaiian usage." I think that the present case falls within some of these exceptions. In part this is a case "otherwise expressly provided  *  *  *  by the laws of the Territory of Hawaii." By Statute, choses in action, including rights of action, are now assignable. Part of the cause and theory sustaining the old common law rule is thus wiped out. Our statute is inconsistent with the old rule. Neither cham-

perty nor maintenance is a criminal offense in this Territory as it was at common law. *Mossman* v. *Hawaiian Government,* 10 Haw. 421, 426. In part it is "otherwise * * * fixed by Hawaiian judicial precedent." In the *Mossman* case just cited it was held that that part of the common law of maintenance which rendered a conveyance by a disseisee to a third party void as to the disseisor is not in force in Hawaii. In *Henrique* v. *Paris,* 10 Haw. 408, 413, 414, it was held that another part of the common law on the subject, to wit, the prohibition against a grantee entering for breach of condition of a lease outstanding from the grantor at the time of the purchase is likewise not law here. In the latter case the court said, inter alia: "The old rule is a provision of the feudal law and grew out of a state of society which does not exist in these Islands. There is not now and here the necessity that there was in England in the Middle Ages for laws against champerty and maintenance to prevent the stirring up of suits for purposes of oppression. * * * The reasons for this rule having ceased the rule itself should also cease." While the court said this, it is true that it also said, "And there can be little doubt that lessors' grantees have hitherto in these Islands acted accordingly and exercised the right of entry for breach of condition, although we do not know of any judicial proceeding directly upon the subject. * * * We are of the opinion that the old common law rule in question is not law here because it is 'otherwise established by Hawaiian national usage.' " In *Rooke* v. *Queen's Hospital,* 12 Haw. 375, 380, this court said, of Sec. 1, R. L., "And since the enactment of that statute the previous rejection of certain material parts of a system has been regarded as amounting to a rejection of other parts." See, also, *Wildey* v. *Crane,* 63 *Mich.* 720, 724.

Perhaps the entering into contracts to bear the expenses of litigation has not been common amongst attorneys in this jurisdiction and yet there have been such contracts. Reputable

members of the bar have undertaken litigation upon those terms without the disapproval as far as I know of the remainder of the bar. As far as there has been any Hawaiian usage on the subject it has been one permitting the practice.

To summarize, then, on this particular subject, in at least two respects the ancient common law rule has been declared by Hawaiian judicial precedent not to be the law here. Some of the judicial utterances on the subject have been broader and would seem to justify the inference that the court in those cases regarded all of the common law on the subject to be inapplicable to Hawaii and not in existence here. In any event that which remains of the rule ought not to be considered as now in force in this jurisdiction. One at least of the rules which gave rise to the provision has been expressly negatived by local statute. Usage, as far as there is one, is against it, and as we have seen in the discussion above the reasons for the rule do not exist in these Islands. For all of these reasons I am of the opinion that the common law on the subject is not in force in Hawaii and that the contract in question is not void.

The chief justice requests me to say that he fully concurs in the foregoing statement on the subject of champerty and maintenance.

The verdict of the jury read in connection with the evidence shows unmistakably that the jury awarded the plaintiff in addition to other items the sum of $250 as a fee paid to E. C. Peters and $50 as a fee paid to C. R. Hemenway, both of the bar, for professional services rendered. Evidence was given tending to show that the plaintiff paid these amounts to the two attorneys respectively, that to Peters being for preparing a brief in the Maile case on the appeal to the supreme court of the United States, and that to Hemenway being for obtaining from the records and officials in Washington certain information desired by Peters and cabling the same to him. The

evidence is at best very meager as to the character and extent of the services rendered by each of the attorneys, but it may be assumed for the purposes of this opinion that it was sufficient to support a finding in a general way of what the services consisted of. There was absolutely no testimony, however, by either of the attorneys mentioned and no other evidence on the subject as to whether or not the amounts charged and paid were reasonable compensation for the services rendered. Neither of the attorneys made any statement on the subject, no experts were called to give their opinions and no attempt was made to show that the amounts paid were a customary charge for such services. From the mere fact of the rendition of the services or the making of the charges by the attorneys no inference can be drawn that the charges were reasonable. This is not a reflection upon the attorneys making the charges. What is a reasonable fee in a given case is often a matter of difficulty for an attorney, however conscientious, to determine either for himself or for another. It might with some force be contended that a trial judge sitting alone or a court of judges could make a finding as to the reasonable value of professional services by an attorney without express evidence of such value; but in that event it could at least be said that the judge or judges had by reason of their prior experience at the bar in the same community qualified themselves as experts to form and express opinions on the subject. With a jury, however, not even that much can be said in favor of such a rule. The jurors are men of various occupations in life other than the practice of the law. Only in rare instances at best will a juror be found who has any practical knowledge as to the value of an attorney's services or as to the varying degrees of complication and difficulty presented in different cases and proceedings. What did the jurors in this case know of the nature of the questions of law to be studied and briefed by counsel? What did they know as to whether the authorities were uniform or in

conflict upon any one or more of the issues? What did they know of the time or care or thought required to analyze the case, and to ascertain the reasoning and the law applicable? Without the evidence of those who are competent to give testimony in such cases it would be unsafe and impracticable to ask of such jurors a statement of what an attorney's services are worth in any given case. The following authorities, while not precisely in point, are worthy of examination: Weeks, Attorneys, p. 696; *Vilas* v. *Downer,* 21 Vt. 418, 423; *Ward* v. *Kohn,* 58 Fed. 462, 463, 464; *Stow* v. *Hamlin,* 11 How. Pr. (N. Y.) 452, 453. 454; *Stanton* v. *Embrey,* 93 U. S. 548; *Railway* v. *Wallace,* 136 Ill. 87, 92; *Knight* v. *Russ,* 77 Cal. 410. 413; *Clark* v. *Ellsworth,* 104 Ia. 442, 451.

In my opinion the evidence on this subject of fees was insufficient to support a verdict for the plaintiff. He did not sustain the burden which the law places upon him to prove the reasonableness of the fees paid.

### CONCURRING OPINION OF DE BOLT, J.

With regard to the validity of the agreement and the attorneys' fees, I adopt the reasoning of Mr. Justice Perry. In all other respects I concur in the opinion of the chief justice.